**Entered on Docket**
**May 28, 2008**
**GLORIA L. FRANKLIN, CLERK**
**U.S BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



**Signed: May 23, 2008**

_____

**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA


In re                                              No. 07-41137 TT
                                                   Chapter 7
CECELIA ANN HILL, etc. and
NORMAN HENRY HILL,

            Debtors.
_____/

NATIONAL CITY BANK,                                A.P. No. 07-4106 AT

            Plaintiff,

      vs.

CECELIA ANN HILL, etc. and
NORMAN HENRY HILL,,

            Defendants.
_____/

### MEMORANDUM OF DECISION

In this adversary proceeding, plaintiff National City Bank (the "Bank"), a foreclosed out former junior deed of trust holder, seeks to except its approximately $250,000 claim from the above-captioned debtors' (the "Debtors") chapter 7 discharge pursuant to 11 U.S.C. § 523(a)(2)(B). For the reasons stated below, the Court will enter judgment in favor of the Debtors.

**SUMMARY OF FACTS**

This adversary proceeding is a poster child for some of the practices that have led to the current crisis in our housing market.

The Debtors bought their home in El Sobrante, California (the "House") nearly 20 years ago for $220,000. They filed for chapter 7 bankruptcy in April 2007. After purchasing the House, as the value of the House increased, the Debtors refinanced the original first deed of trust to obtain additional cash. They also obtained a junior deed of trust, which they refinanced several times. At the time they filed their bankruptcy petition, the Debtors scheduled the debt secured by the House as totaling approximately $683,000.

The Debtors' income was modest. Mr. Hill was a parts manager at Auto Wholesaling, earning an annual salary of up to $39,000, depending on overtime. Mrs. Hill was self-employed, using a dba of C Ann H Distributing, distributing free periodicals for various companies. Her income also fluctuated, depending on how many companies were employing her for this purpose. According to the Debtors' Statement of Financial Affairs, filed in their bankruptcy case, in 2006, Mrs. Hill's annual gross income was between $25,000 and $26,000. It appears doubtful that the Debtors' combined annual gross income was ever greater than $65,000.

In April 2006, Mrs. Hill contacted a mortgage broker, Winston Ellerbeck ("Ellerback"), seeking to refinance the Debtors' existing second deed of trust debt. Ellerback, who testified at trial, stated that he had acted as the Debtors' loan broker on five prior occasions. At that time, the second deed of trust was held by

2

someone other than the Bank. The debt secured by the second deed of trust had a balance of approximately $100,000. The Debtors sought and obtained from Bank an equity line of credit for $200,000, thereby obtaining approximately $60,000 in cash after paying the cost of the refinance and other consumer obligations. They used the cash to pay off their consumer debt and to "fix up" the House.

In the loan application submitted to obtain this loan (the "April Loan Application"), Mr. Hill's monthly income was listed as $8,176 (i.e., $98,112 on an annual basis) and Mrs. Hill's annual income was listed as $3,967 (i.e., $47,604 on an annual basis) for a combined annual income of approximately $12,143 (i.e., $145,716 on an annual basis). Ellerback stated that he obtained this income information from Mrs. Hill over the phone, inputted it into the application form, and sent the application to the Debtors for their signature.[1]

In October 2006, the Debtors were in need of more cash. The Bank permitted them to increase their equity line of credit to $250,000. This time, instead of contacting Ellerback to handle the

---

[1] Mrs. Hill denied having told Ellerback that her and her husband's incomes were in the amounts set forth on the loan application. She and her husband both testified that they had not read the loan application before signing it and that moreover they had never read a loan application in their lives. The Bank presented evidence that called into question the credibility of this testimony. In April 2006, together with the loan application, Ellerback sent the Debtors an estimated closing statement for their signatures. He had inadvertently checked a box on the second page of the document in a section dealing with pre-payment penalties. Mrs. Hill called Ellerback and told him about the error. He told her to cross it out and initial the change. She did so.

3

transaction, Mrs. Hill dealt with the Bank directly. On this loan application (the "October Loan Application"), Mr. Hill's income was listed as $5,600 per month (i.e., $67,200 on an annual basis) and Mrs. Hill's income was listed as $10,300 per month (i.e., $123,600 on an annual basis) for a total of $15,900 (i.e., $190,800 on an annual basis). Again, Mrs. Hill denied having provided this income information to the Bank.

The Bank did not call as a witness the individual who took the information for the loan application from Mrs. Hill. The only Bank employee who testified was Dick Eubanks ("Eubanks"), the District Manager for one of the Bank's subsidiaries. He testified that he did not know if the individual in question was still employed by the Bank. However, he noted that both this loan and the loan obtained by the Debtors in April 2006 were "stated income" loans which did not require verification of income. Eubanks testified that the loans were generated for the purposes of sale and that certain guidelines (the "Guidelines") had to be followed to render them acceptable for that purpose. He testified that the Bank followed the Guidelines. A copy of the Guidelines was introduced into evidence.

The Guidelines stated that, for a borrower who was employed, the only requirement was verification of employment, not verification of income. However, the Guidelines stated that a third party vendor would evaluate the reasonableness of the stated income based on job type, tenure, and geographical location among other things. No evidence was presented that a third party vendor ever evaluated

4

whether it was reasonable for an automobile parts manager in the San Francisco Bay Area to earn $98,112 on an annual basis.

According to the Guidelines, for a borrower who was self-employed, the Bank could choose one of three types of verification: (1) a copy of the borrower's business license, (2) a copy of the most recent month's bank statement reflecting liquidity at least equal to one-tenth of the borrower's annual income, or (3) a CPA letter verifying the existence and ownership of the business. The Bank chose the third option with respect to Mrs. Hill. With respect to this option, the Guidelines stated that: "[i]nternal procedures...[would] be performed to verify the legitimacy of the letter." A copy of a letter verifying the existence and ownership of Mrs. Hill's business was introduced into evidence. The letter was written on the letterhead of a CPA, but was signed by someone other than the CPA whose name was on the letterhead. Evidence was also introduced that the Bank had verified the existence of the CPA on the letterhead. However, no evidence was presented that the Bank had verified the identity or credentials of the person who signed the letter.

The only other requirements established by the Guidelines with respect to the April 2006 loan were that the collateral be the borrower's primary residence, the loan not exceed $350,000, the borrower's FICA score be sufficiently high, and the loan to value and debt to income ratios satisfy certain criteria.[2] The value of the

---

[2] The Guidelines require a maximum debt to income ratio of .45, and a maximum loan to value ratio of .899.

5

House was determined through the Bank's underwriting process. It was unclear whether the Bank performed the appraisal itself or obtained a third party vendor to do so. In April 2006, the House had been appraised at $785,000. In October 2006, the House was appraised at $856,000. Shortly after the Debtors filed for bankruptcy in April 2007, the first deed of trust holder purchased the House at its foreclosure sale pursuant to a credit bid based on a secured debt of approximately $450,000, no one having submitted an overbid.

## DISCUSSION

### A. APPLICABLE LAW

A creditor seeking to establish a debt as nondischargeable under § 523(a)(2)(B) must demonstrate that: (1) The debtor made a written representation of respecting the debtor's financial condition; (2) the representation was material; (3) the debtor knew at the time the representation was made that it was false; (4) the representation was made with the intent to deceive the creditor; (5) the creditor relied on the representation; (6) the reliance was reasonable; and (7) the damage suffered by the creditor proximately resulted from the representation.[3] In re Candland, 90 F.3d 1466,

---

[3] Section 523(a)(2)(B) reads in relevant part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's . . . financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;

6

1470 (9th Cir. 1996).  The creditor must prove each element by a

preponderance of the evidence.  <u>Grogan v. Gardner</u>, 498 U.S. 279,

291 (1991).

A statement is materially false if it is substantially

inaccurate and affects the creditor's decision making process. <u>See</u>

<u>Candland</u>, 90 F.3d at 1470 (9th Cir. 1996).  Significant

misrepresentations of financial condition are generally considered

material. <u>Id.</u>

A debtor's intent to deceive for nondischargeability purposes

under § 523(a)(2)(B) requires either a finding that the debtor

actually knew the statement was false, or can be inferred from the

totality of the circumstances, including the debtor's reckless

disregard for the truth. <u>In re Gertsch</u>, 237 B.R. 160, 167-68

(Bankr. 9th Cir. 1999).  Where the debtor knows the purpose of

documents and that they contained statements of the debtor's

financial condition, the debtor's failure to question the accuracy

of the documents constitutes reckless disregard for the truth of

the statements, and justifies a finding of fraudulent intent under

§ 523(a)(2)(B).  <u>In re Oh</u>, 278 B.R. 844, 858-60 (Bankr. C.D. Cal.

2002).

---

    and
    (iv) that the debtor caused to be made or published with
    intent to deceive.

11 U.S.C. § 523(a)(2)(B).  The Ninth Circuit reorganized these
factors into a seven-factor analysis. <u>In re Siriani</u>, 967 F.2d 302,
304 (9th Cir. 1992).

7

Whether the creditor reasonably relied on the materially false statement under § 523(a)(2)(B) is measured objectively by the degree of care exercised by a reasonably cautious person in the same transaction under similar circumstances. See Gertsch, 237 B.R. at 170; (citing In re Cohn, 54 F.3d 1108, 1117 (3d Cir. 1995)). Absent other factors, a creditor's reliance on a statement of financial condition is reasonable if it followed its normal business practices. See id. Other factors that may be affect whether the creditor's reliance on its own standard lending practices is reasonable include the standards of the creditor's industry in evaluating creditworthiness, and the existence of any "red flags" that would alert the reasonably prudent lender of the possibility that the information was inaccurate. Cohn, 54 F.3d at 1117.

When there is evidence of materially false statements made by the debtor, only minimal investigation is required by the creditor to have reasonably relied on the debtor's representation. In re Gosney, 205 B.R. 418, 420 (9th Cir. B.A.P. 1996) (citing Candland, 90 F.3d 1466, and In re Lansford, 822 F.2d 902, 904 (9th Cir. 1987)).

**B.  DECISION**

As set forth above, the Ninth Circuit has identified seven elements to a claim under § 523(a)(2)(B).  The creditor seeking to except its debt from the debtor's discharge must prove each of these elements by a preponderance of the evidence.

8

The first two elements of the Bank's claim were not in dispute:  i.e., that the Debtors made a false representation to the Bank in writing concerning their financial condition and that the misrepresentation was material.  The Debtors admitted that they submitted the October Loan Application and that the figures listed for their incomes were significantly overstated.  Those representations concerned their financial condition and were false.  Thus, the first element of the Bank's claim is established.  If their true incomes had been disclosed, the Debtors would not have qualified for the loan.  Their debt to income ratio would have exceeded the maximum permitted by the Guidelines.  Thus, the false representation was material, thereby establishing the second element of the Bank's claim.[4]

The Court concludes that the Bank met its burden of proof with respect to the second and third elements of its claim: i.e., that the Debtors knew that the representation was false at the time it was made and that they made the representation with the intent to deceive the Bank.  The Debtors testified that they did not supply the false figures regarding their income and did not read the October Loan Application before they signed it.  As a result, they contended, the Bank failed to establish either their knowledge or

---

[4] The Debtors testified that they did not read the October Loan Application before signing it and submitting it to the Bank. Even if this were true, by signing the Application and submitting it to the Bank, they effectively made the representation to the Bank.  Their testimony, if believed, would pertain solely to the next two elements of the Bank's claim: i.e., knowledge of falsity and intent to deceive.

9

the falsity of the representation or their intent to deceive the Bank. The Court did not find their testimony credible.

In large part, this conclusion is drawn from the evidence presented with respect to the April 2006 loan. The April Loan Application also contained false figures with respect to the Debtors' income. The Debtors also testified that they did not supply this income information and did not read the April Loan Application before they submitted it to the Bank.

Their testimony was contradicted by their loan broker. Ellerback testified that Mrs. Hill provided him with the income information. He also testified that, before signing and submitting the April Loan Application, Mrs. Hill caught a mistake he had made in one of the loan documents and called it to his attention. The Court found Ellerback to be a more credible witness than Mrs. Hill. The Debtors' lack of credibility concerning the April 2006 loan transaction undermines the credibility of their testimony concerning the October 2006 loan transaction.[5]

Moreover, the Hills, while not highly educated, were not unsophisticated. They had obtained numerous home and car loans and were familiar with the loan application process. They knew they were responsible for supplying accurate information to a lender concerning their financial condition when obtaining a loan. Even if the Court were persuaded that they had signed and submitted the

_____

[5] The Court also found it likely that Mrs. Hill avoided using Ellerback to obtain the October 2006 loan for fear that he would have questioned her concerning the changes in their income figures as compared to six months earlier.

10

October Loan Application without verifying its accuracy, their reckless disregard would have been sufficient to satisfy the third and fourth elements of the Bank's claim. See Oh, 278 B.R. at 858-60 (Bankr. C.D. Cal. 2002).

However, the Bank's suit fails due to its failure to prove the sixth element of its claim: i.e., the reasonableness of its reliance.[6] As stated above, the reasonableness of a creditor's reliance is judged by an objective standard. In general, a lender's reliance is reasonable if it followed its normal business practices. However, this may not be enough if those practices deviate from industry standards or if the creditor ignored a "red flag." See Cohn, 54 F.3d at 1117. Here, it is highly questionable whether the industry standards--as those standards are reflected by the Guidelines--were objectively reasonable. However, even if they were, the Bank clearly deviated to some extent from those standards. In addition, the Bank ignored a "red flag" that should have called for more investigation concerning the accuracy of the income figures.

As noted above, the Guidelines required an evaluation of the reasonableness of the salary listed by an employed borrower based on job type and geographical area, among other things. No evidence was provided by the Bank that this evaluation was done. Additionally, with respect to a self-employed individual, the

---

[6] Given the Court's conclusion with respect to this element, it need not address the seventh element of the Bank's claim, proximate cause.

11

Guidelines required a letter from a CPA verifying the existence and ownership of the business. While the letter relied upon by the Bank verifying the existence and ownership of Mrs. Hill's business was on the letterhead of a CPA, whose existence was itself independently verified by the Bank, the letter was not signed by the CPA. The person signing the letter did not identify himself as a CPA and may not even have been an employee of the CPA on whose letterhead the letter was written.

More important, the Bank ignored the "red flag" established by the variation in the incomes set forth on the April Loan Application as compared to the incomes set forth on the October Loan Application. The Bank employee handling the loan transaction in October 2006 knew that the Bank had made a loan to the Debtors just six months earlier and that they were now attempting to increase the amount of the loan. The employee necessarily had at her disposal the file with respect to the earlier loan. Not only were the total income figures on the October 2006 Loan Application substantially higher than the figures on the October 2006 Loan Application, the income figures for the spouses were switched. The total annual income listed for the Debtors on the April 2006 Loan Application was $145,716. On the October Loan Application, it was $190,000. On the April Loan Application, Mr. Hill's annual income was listed as $98,112 and Mrs. Hill's as $47,604. On the October Loan Application, Mr. Hill's annual income was listed as $67,200 and Mrs. Hill's as $123,600.

12

Based on the foregoing, the Court concludes that either the Bank did not rely on the Debtors representations concerning their income or that its reliance was not reasonable based on an objective standard. In fact, the minimal verification required by an "income stated" loan, as established by the Guidelines, suggests that this type of loan is essentially an "asset based" loan. In other words, the Court surmises that the Bank made the loan principally in reliance on the value of the collateral: i.e., the House. If so, the Bank obtained the appraisal upon which it principally relied in making the loan. Subsequent events strongly suggest that the appraisal was inflated. However, under these circumstances, the Debtors cannot be blamed for the Bank's loss, and the Bank's claim should be discharged.

## CONCLUSION

While the Court finds and concludes that the Debtors made a material false representation concerning their financial condition to the Bank in October 2006, with knowledge of its falsity and the intent to deceive the Bank, the Court finds and concludes that the Bank's nondischargeability claim under § 523(a)(2)(B) must fail. The Bank failed to prove that it reasonably relied on the Debtors' false representation concerning their income, as set forth in the October Loan Application. As a result, the Bank's claim has been discharged. Judgment will be ordered accordingly.

END OF DOCUMENT

13

COURT SERVICE LIST

Joshua Scheer
Scheer Law Group
155 N Redwood Dr. #100
San Rafael, CA 94903

Cecelia Ann Hill
Norman Henry Hill
3621 Ponderosa Trail
Pinole, CA 94564

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

14